# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3092

_____

Kirk Manuel

*Plaintiff - Appellant*

v.

MDOW Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Helena

_____

Submitted: April 16, 2015
Filed: June 29, 2015

_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Kirk Manuel sued his insurance provider, MDOW Insurance Company, after MDOW refused to cover the loss of Manuel's house to a fire. A jury found in favor of MDOW, and Manuel moved for a new trial. The district court[1] denied the motion.

---

[1] The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas.

Manuel appeals the denial of his motion and contests the court's admission of certain evidence at trial. We reject his claims and affirm the judgment.[2]

## I. Background

On September 14, 2011, Manuel's home burned down while he and his family were vacationing in Las Vegas. Manuel had insured his home through MDOW with a policy providing $150,000 for the house, $75,000 for personal property, and $45,000 for added costs. Manuel filed a claim for the fire, but MDOW denied it. MDOW told Manuel that it believed he or someone acting on his behalf had intentionally set the fire and that Manuel's claim form contained fraudulent information.

Manuel sued MDOW in Arkansas state court for breach of contract, and MDOW removed the case to federal court. During the trial, Richard Eley testified as an expert witness for MDOW. Manuel did not object to Eley's testimony or certification as an expert witness. Eley testified that he had nearly 40 years of experience investigating fires. He opined that someone had intentionally set the fire that destroyed Manuel's home. He reached this conclusion after eliminating other potential causes of the fire and after speaking with Manuel. Counsel for Manuel questioned Eley extensively about his methods, comparing them to those detailed in the National Fire Protection Association 921 Guide for Fire and Explosion Investigations (NFPA 921).[3] Counsel noted that NFPA 921 recommends against

---

[2]We have jurisdiction over this appeal under 28 U.S.C. § 1291.

[3]"The NFPA is a nonprofit organization dedicated to fire prevention, and NFPA 921 is a document intended to 'establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents.'" Russell v. Whirlpool Corp., 702 F.3d 450, 454 (8th Cir. 2012) (citing NFPA 921 §1.2.1).

using a "negative corpus" method, which involves "eliminating all ignition sources found, known, or believed to have been present in the area of origin" to prove the fire was set intentionally. NFPA 921 § 18.6.5 (2011). Eley insisted that everything he did "was scientific, and it followed NFPA 921." But Eley also disagreed with some parts of NFPA 921, including its description of negative corpus:

> And what I believe negative corpus would be is if I came into this room and all I had was the light fixtures and the switches and things like that, I did not have a chance to talk to the owner or the last person in, and just from just looking around and saying, well, I don't see anything that could have caused it, well, boom, you know, that in my mind might be negative corpus.

> On the other hand, if you do a physical examination of everything in the area where the fire started and you can't find anything in that area that shows evidence that it caused a fire, and then I'm able to talk to the owner, like Mr. Manuel, or whoever the last person was in the house at the time of the fire, and they gave me all the information that I've talked about already from him, that nothing was on, there was no problems, nothing stored in the house of a flammable nature, I believe that goes beyond the negative corpus . . . .

That additional human element, Eley posited, led him to the only possible conclusion: The fire had been intentionally set.

After a three-day trial, a jury returned a special verdict in MDOW's favor after deliberating for only 45 minutes. The jury found that MDOW proved by a preponderance of the evidence that Manuel "either burned his home or caused it to be burned." The jury did not decide whether Manuel had intentionally misrepresented information during the fire investigation.

Manuel then moved for a new trial. He swore in an affidavit that two jurors—Juror W and Juror C—had failed to disclose relationships with five of his

witnesses. Manuel asserted that these two jurors had either actual or implied bias based on these undisclosed relationships. Manuel also attached affidavits from his witnesses. One witness, Corey Watson, said that Juror W is his cousin.[4] Watson, however, did not know Juror W was on the jury until Watson made eye contact with the juror during the trial. According to Watson, the two had attended a family funeral together several weeks before trial. Nicholas Skinner, a named witness who was in the court during the trial but did not testify, said that Juror W had once halted a fight between Skinner and another student when Skinner was in junior high school. Skinner had a knife during the fight. Manuel's son Deangelo Manuel, who did testify at trial, said in his affidavit that Juror W was a coach and teacher at the junior high school and the high school he had attended. Deangelo Manuel also said that his mother, Tawanna Manuel, had once introduced him to Juror W in 2004 or 2005.

Manuel also attached affidavits from two witnesses who said they knew Juror C. Testifying witness Jacqueline Strother said that Juror C was a childhood friend, and the two had attended the same "middle, junior high, and high school." Strother said that Juror C married a man to whom Strother was once engaged. Melissa Cartwright said that Juror C was an art teacher and had taught Cartwright's autistic son. Cartwright said she also had once met Juror C during a meeting with all of Cartwright's son's teachers. She stated in her affidavit that she had testified at the trial; but in fact, neither party called her as a witness, and she never testified.

The district court rejected Manuel's arguments and denied the motion. The court noted that the Eighth Circuit has not adopted an "implied bias" test of juror impartiality. The court concluded that, even under that test, there was insufficient potential bias alleged to warrant a new trial. Although Juror W is a cousin of one witness, the court noted, the evidence showed that they are not "close relatives" as is required to presume bias. Nor had Manuel submitted evidence to establish that any

---

[4]We note that Juror W's last name is not Watson.

witness was actually biased against him because of a preexisting relationship. Manuel now appeals.

## II. Discussion

### a.    Motion for New Trial

Manuel first argues that the district court wrongly denied his motion for a new trial. He says that the court should have held an evidentiary hearing to determine whether Jurors W and C had actual bias. He asserts that the jurors' undisclosed relationships with some of his witnesses "gives rise to a natural inference" that they were being dishonest about their ties to the case, rather than merely inaccurate about whom in the trial they knew. Alternatively, Manuel implores this court to adopt an implied bias test at least with respect to Juror W, who is a cousin of a witness.

This court reviews the denial of a motion for a new trial for abuse of discretion. Hiser v. XTO Energy, Inc., 768 F.3d 773, 776 (8th Cir. 2014). The question before this court is whether a reasonable person could have reached the same decision, not whether one would have. Id. To receive a new trial based on concealed juror bias, Manuel had to prove "(1) that the juror answered dishonestly, not just inaccurately; (2) that the juror was motivated by partiality; and (3) that the true facts, if known, would have supported striking the juror for cause." United States v. Ruiz, 446 F.3d 762, 770 (8th Cir. 2006); see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (holding that to obtain a new trial based on concealed juror bias, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause").

### 1. Juror W

For proof of Juror W's bias, Manuel points to more than just his witnesses' affidavits. During jury selection the district court read a list of anticipated witnesses to the potential jurors. The court admonished the jurors to answer counsels' questions honestly and to disclose whether they knew either party or any witness. Juror W explained that he was a retired teacher from Central High School, which at least one potential witness had attended.[5] Specifically, Juror W admitted that he knew Brett Ford, one of Manuel's witnesses, whom he had taught several years earlier. Juror W said he did not believe that relationship would affect his impartiality as a juror. Neither party moved to strike Juror W for cause. Juror W did not disclose a relationship with any other witness. After Tawanna Manuel testified, however, Juror W told the district court that he knew Tawanna from her time in school. He told the court he did not believe that relationship would affect his impartiality. Neither party moved to exclude Juror W.

Manuel asserts that Juror W revealed "his more innocuous relationships" that would not prevent his serving on a jury but did not disclose his relationships with the other witnesses. Manuel cites the affidavits of Skinner and Deangelo Manuel as evidence that Juror W intentionally withheld evidence of his relationships with those witnesses. Manuel says that Juror W's failure during jury selection to identify these other two witnesses as individuals he had known or taught in school establishes a pattern of dishonesty that, if exposed, would have led to a challenge for cause.

---

[5]Both Skinner and Deangelo Manuel swore in their affidavits that Juror W also had taught at the junior high school they attended. Deangelo Manuel also swore that Juror W taught at a different high school that Tawanna Manuel had attended. Juror W did not confirm during jury selection whether he had taught at numerous schools; he said only that he had retired from Central High School in 2010.

We disagree with Manuel's assessment of the evidence. First, neither Deangelo Manuel nor Skinner says that Juror W was *his* teacher: Deangelo Manuel says only that Juror W was *a teacher* at his junior high school whom he had once met, and Skinner says Juror W once broke up a fight involving Skinner. Moreover, Skinner did not testify. And there is no evidence that Juror W even saw Skinner or, if he did, recognized him from the fight at the school.

Second, the "pattern" Manuel points to is illusory. As a teacher who had recently retired, Juror W likely taught numerous students over the years. Yet, in their affidavits, neither Deangelo Manuel nor Skinner identified himself as one of Juror W's former students. And, significantly, Juror W told the court about the two former students he *did* recognize, Brett Ford and Tawanna Manuel. Though we are not entirely sure what Manuel means by an "innocuous relationship," we note that Tawanna Manuel is Manuel's ex-wife; and Juror W informed the court and the parties that he had been one of her teachers. Whatever Manuel's definition, it is unclear how the relationship between Juror W and Tawanna Manuel falls into the category of "innocuous," while the purported relationships to Deangelo Manuel and Skinner—whom Juror W apparently did not teach and may not know at all—do not. Rather, the relationship between Juror W and the Plaintiff's ex-wife would seem particularly noteworthy and even more likely to create cause to excuse Juror W. Yet after Juror W informed the court and the parties that he knew Tawanna Manuel, neither party asked that he be excused. Counsel for Manuel expressly stated, "I don't have any problem with him."

Moreover, Juror W's honesty about those relationships suggests he simply did not remember the other witnesses. See Ruiz, 446 F.3d at 770 (noting that a juror's self-disclosure reflects the juror's honesty). We presume that a prospective juror is impartial. See Moran v. Clarke, 443 F.3d 646, 650 (8th Cir. 2006). And Manuel submitted no evidence to counter that presumption or to support his assertions that Juror W dishonestly, rather than inaccurately or mistakenly, answered the questions

during jury selection or was motivated to be partial. See McDonough Power Equip., 464 U.S. at 556.

Manuel also says Juror W's "close familial relationship[]" to one witness, Corey Watson, could have created "negative emotions." Manuel asserts that the district court should have granted a hearing to determine whether that relationship "was close enough to give rise to implied bias."

Though we have never adopted an implied-bias test for juror partiality, we have noted that "prejudice may be implied in certain egregious situations." Sanders v. Norris, 529 F.3d 787, 792 (8th Cir. 2008) (quoting Johnson v. Armontrout, 961 F.2d 748, 756 (8th Cir. 1992)). Implying bias, however, is limited to "extreme situations" in which "the relationship between a prospective juror and some aspect of the litigation . . . [makes it] highly unlikely that the average person could remain impartial in his deliberations." Id. (quoting Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988)). Examples of an "extreme situation" include when a "juror is a close relative of one of the participants in the trial or the criminal transaction." Id. at 792–93 (quoting Smith v. Phillips, 455 U.S. 209, 222 (1981) (O'Connor, J., concurring)). We have relied on the examples from Justice O'Connor's concurrence when rejecting a claim of implied juror bias. See id. at 793; United States v. Tucker, 243 F.3d 499, 509 (8th Cir. 2001).

Corey Watson said he and Juror W are cousins and had attended a funeral together weeks earlier. Manuel cites United States v. Mitchell, 690 F.3d 137, 145 (3d Cir. 2012), for the proposition that "consanguinity is the classic example of implied bias." That may be so, but we think the familial relationship must resemble something closer than what we have in this case to imply bias. Indeed, the court in Mitchell likewise rejected "the most expansive formulations that categorically presume bias whenever a juror shares any degree of kinship with a party in a case." Id. at 146. That court noted that a distant relative generally "is unlikely to harbor the

-8-

sort of prejudice that interferes with the impartial discharge of juror service." Id. We agree with that assessment.

In this case, Watson says simply that he is a cousin of Juror W without specifying whether he and Juror W are first cousins or related more distantly. Watson does not say that he traveled with Juror W to the funeral together, interacted with him while there, or communicated with him since. And Watson said it was not until he was on the stand and made eye contact with Juror W that he realized he knew Juror W. As for Juror W himself, there is nothing in the record to suggest he recognized Watson by name or appearance. These facts do not suggest that Watson is a "close relative" of Juror W or that their relationship made it "highly unlikely" that Juror W could not remain impartial. Manuel offers nothing to show that the familial relationship between Juror W and Watson was sufficiently close to "engender negative emotions," as Manuel suggests. As the district court properly concluded, this is not an "extreme case" in which bias should be implied.

### 2.    Juror C

As he did regarding Juror W, Manuel asserts that Juror C's actions during trial provide additional evidence of bias. During Jacqueline Strother's testimony, Juror C mouthed to the district judge that she knew Strother. After Strother's testimony, and outside the presence of the jury, Juror C explained that the two went to school together but had not remained friends. Juror C said she saw Strother where Strother worked about one year before the trial. She said she did not believe that relationship would affect her jury service. When given the opportunity, neither party questioned Juror C about this relationship or moved for her removal. Juror C also taught the son of another named witness, Melissa Cartwright, who ultimately did not testify at the trial. Manuel says Juror C's failure to disclose these relationships suggests that she harbored actual bias against those witnesses and, thus, against Manuel.

Again, we disagree with Manuel's interpretation of the evidence. Strother said that Juror C married a man to whom Strother was engaged when Strother was 18 years old. But Strother does not say that she ended her engagement because of Juror C's involvement or that Juror C is now her "rival," as Manuel words it. Her affidavit provides no added description of her relationship with Juror C other than that the two were "childhood friends" and attended the same schools. And even if there is unspoken ill-will between these two, Manuel points to nothing in the record to suggest Juror C has an actual bias against *Manuel* or that her adverse relationship with Strother led her to vote in favor of MDOW. See United States v. Gianakos, 415 F.3d 912, 923 (8th Cir. 2005) (affirming district court's denial of motion to replace juror because defendant provided no evidence that the juror was biased *against him*).

And, like Juror W had, Juror C informed the court and the parties that she recognized Strother after Strother entered the courtroom to testify. Juror C acknowledged the childhood relationship they had but said she did not believe it would affect her partiality. Juror C's self-disclosure suggests her honesty, not an intent to deceive. See Ruiz, 446 F.3d at 770. Moreover, Manuel did not move to strike Juror C or note any concern about her remaining on the jury after she revealed her past with Strother. See Crimm v. Mo. Pac. R.R. Co., 750 F.2d 703, 708 (8th Cir. 1984) (rejecting claim of juror bias because during voir dire appellant expressly agreed to keep juror on panel). As for Melissa Cartwright, she did not testify at trial, though she swore in her affidavit that she did. Again, Manuel has failed to present any evidence to support the conclusion that Juror C's relationship with these two witnesses showed improper bias.

Because there is no evidence that either juror had an actual bias against Manuel, or that the circumstances presented an "extreme situation" from which we could imply bias, we conclude that the district court properly denied the motion for a new trial. Also, we conclude that the district court acted within its discretion to deny an evidentiary hearing on this issue. See United States v. White Bull, 646 F.3d

1082, 1095 (8th Cir. 2011) (noting that district court should grant evidentiary hearing only if allegations of misconduct are substantiated and serious). Manuel's only evidence of bias, other than the information the jurors themselves offered at trial, was the affidavits provided by his witnesses. These affidavits are bereft of detail to suggest a hearing would have provided the court more evidence of a serious issue of misconduct. Such skeletal assertions are not enough to warrant an evidentiary hearing. Cf. United States v. Schoppert, 362 F.3d 451, 459 (8th Cir. 2004) (noting that party seeking evidentiary hearing on claim of jury taint "needs to make a showing that his allegation is credible and that the prejudice alleged is serious enough to warrant whatever action is requested").

### b. Fire Science Expert Testimony

Manuel next argues that the district court erred by allowing the testimony of MDOW's expert witness, Richard Eley. Manuel says the court should have rejected Eley's testimony because, Manuel insists, Eley relied on the "negative corpus" method that NFPA 921 has rejected to determine the cause of the fire. Manuel asserts that the jury's verdict rested on this improper testimony, without which there is no evidence that the fire was set intentionally.

Manuel did not move *in limine* to exclude Eley's expert testimony, nor did he object to the admission of Eley's testimony during the trial. Thus, our review is for plain error. See Olson v. Ford Motor Co., 481 F.3d 619, 626–27 (8th Cir. 2007). This court has qualified NFPA 921 as "'a reliable method endorsed by a professional organization'" for determining the cause of a fire. Russell, 702 F.3d at 455 (quoting Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1058–59 (8th Cir. 2005)). Following NFPA 921 is not the only method of fire investigation that we have approved. Id. But if an expert purports to have followed NFPA 921, he must have followed it reliably, or his testimony may be excluded. Id. (citing cases).

-11-

During direct examination, Eley did not acknowledge NFPA 921 nor did he say he followed it. Counsel for Manuel first mentioned NFPA 921 on cross examination and asked Eley whether he followed NFPA 921. Eley responded that his method "was scientific, and it followed NFPA 921." But Eley also testified that he considered NFPA 921 "a guide" and "not accurate in every case." He explained that his method of investigating this fire was not "negative corpus" as NFPA 921 defines it. Instead, he conducted "a physical examination of everything in the area where the fire started" and then talked to Manuel. Manuel told Eley "that nothing was on, there was no problems, nothing stored in the house of a flammable nature." It was only with Manuel's added information, Eley testified, that he was able to conclude that the fire was incendiary.

We have some concern about Eley's testimony. On direct examination, he did not say that he followed NFPA 921 when conducting his investigation; but later, on cross examination he said that his investigation did follow that guide. Eley also testified at trial that he disagreed with the NFPA 921 definition of negative corpus and said he did not apply negative corpus methodology as he understood it. He then proceeded to supply his own definition of negative corpus, as well as a description of why he believed the methodology he used in the investigation of the Manuel fire was *not* negative corpus. But the only difference Eley gave between NFPA 921's description of negative corpus and his own applied method was the "human element" of speaking to Manuel about the condition of his home before he had left for Las Vegas. And Manuel told Eley only that no appliances were left on and nothing flammable was left in the house, allowing Eley to eliminate those additional potential sources of the fire's origin. Viewed in this way, the additional information Eley relied on does not "go[] beyond the negative corpus" as Eley purported.

But even with these concerns, the admission of Eley's testimony did not amount to plain error for two reasons. First, Eley determined the origin of the fire based on his observations at the scene and nearly 40 years of experience investigating

fires. We have held that an expert may base his final determination of a fire's cause on those two factors. See Russell, 702 F.3d at 457; Shuck v. CNH America, 498 F.3d 868, 875 (8th Cir. 2007); Hickerson v. Pride Mobility Prods. Corp., 470 F.3d 1252, 1257 (8th Cir. 2006). Eley testified that after speaking with Manuel, he examined the house while taking photographs of the damage. He determined that the area of origin was in the southeast corner of the house near the kitchen where the damage was heaviest because, as he explained, "it burns hotter there. It burned longer there, the combustible materials would." The wall studs also were missing, a sign of intense heat; there was oxidation on one side of the stove and refrigerator, suggesting the direction of the flames; and the wiring had melted and shorted. Because Manuel assured Eley that nothing had been left on, there were no problems in the house, and no new appliances were in the home, Eley concluded that the fire had been set intentionally.

Second, despite framing his argument on appeal as one against Eley's expert opinion, Manuel's actual argument is that the jury should not have credited Eley's testimony. Manuel did not object to any part of Eley's testimony describing his methodology, his qualifications as an expert witness, or his observations and ultimate conclusions. Instead, Manuel chose to cross examine Eley by pointing out possible inconsistencies between the methods Eley used and what NFPA 921 prescribes. In particular, the jury heard how Eley defined "negative corpus" and that his definition differed from that in NFPA 921. It is possible the jury could have found that Eley's definition was no different than the NFPA 921 definition, that he improperly applied negative corpus methodology, and that MDOW had failed to offer any evidence that the fire was intentional. That is likely the result Manuel had in mind when adopting his strategy of challenging Eley's testimony through cross examination rather than a motion to exclude his expert testimony. Yet despite the vigorous cross examination, the jury apparently credited Eley's testimony sufficiently to find in favor of MDOW. Thus, even if Eley's conclusion regarding the source of the fire was improper under NFPA 921's definition of negative corpus, we

-13-

cannot conclude that allowing his testimony, without any objection from Manuel, prejudiced Manuel and thus constituted plain error. See Rush v. Smith, 56 F.3d 918, 922 (8th Cir. 1995) (noting that under plain-error review, an error without objection "is grounds for reversal only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice").

### III. Conclusion

For the reasons discussed above, we affirm the judgment of the district court.

_____