# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-1959

_____

Walmart Inc., a Delaware corporation

*Plaintiff - Appellee*

v.

Cuker Interactive, LLC, a California limited liability company

*Defendant - Appellant*

_____

No. 18-2081

_____

Walmart Inc., a Delaware corporation

*Plaintiff - Appellant*

v.

Cuker Interactive, LLC, a California limited liability company

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: September 25, 2019
Filed: February 12, 2020

_____

Before SMITH, Chief Judge, BEAM and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Walmart, Inc. ("Walmart") and Cuker Interactive, LLC ("Cuker") signed a contract under which Walmart agreed to pay Cuker a fixed fee to make the website for Walmart's "ASDA Groceries business" accessible from desktop computers and mobile devices. Shortly after the project launched, the parties experienced fundamental disagreements over the terms of the contract that ultimately led to protracted litigation. The jury returned a verdict in favor of Cuker on its claims against Walmart for breach of contract, unjust enrichment, and misappropriation of trade secrets. Pursuant to the contract's limitation-of-liability clause, the district court[1] reduced the amount of damages awarded by the jury and entered judgment in favor of Cuker. After the filing of extensive post-trial motions, the court further reduced the damages awarded to Cuker on the ground that Cuker presented insufficient evidence to demonstrate it undertook reasonable efforts to maintain the secrecy of three of the four alleged trade secrets. The district court found in favor of Cuker on all other issues. Both parties appeal. We affirm.

## I.      Background

Walmart's UK subsidiary, ASDA Groceries, had an e-commerce website accessible from desktop computers and another one accessible from mobile phones.

_____

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Walmart understood that if it could make its desktop website "responsive" (accessible from any device), it could eliminate the mobile-phone website. In January 2014, a Walmart senior executive approached Cuker's Chief Creative Officer and CEO about making ASDA Groceries' website responsive. Around the same time, Walmart was also exploring opportunities to make its United States grocery website, Walmart2Go, responsive.

On January 30, 2014, Walmart and Cuker signed a consulting agreement accompanied by a document entitled statement of work ("contract") under which Walmart agreed to pay Cuker a fixed fee of $577,719 in exchange for responsive layouts for the ASDA website. Under the contract, Cuker was to design and build thirteen templates for access by desktops, tablets, and smartphones, including a homepage template, a top navigation template, a bottom navigation template, and ten templates to be chosen by Walmart. Because of Walmart's tight internal deadlines for completion of the project, the contract was negotiated and signed in a matter of weeks. Accordingly, the parties considered the contract a "working version" that could be "refined" along the way.

The project launched almost immediately in early February 2014. But, by the end of the month, the parties disagreed over basic terms of the contract, including whether various milestones for performance were strict deadlines or simply aspirational, when interim fee payments were due, how many rounds of revisions Walmart could require Cuker to make to its deliverables, and whether particular demands by Walmart were outside of the scope of work that Cuker had contracted to perform. These disputes caused payment and delivery delays.

Walmart won the initial race to the courthouse when it filed a breach-of-contract lawsuit against Cuker in Arkansas state court in July 2014. Cuker removed the action and filed counterclaims for breach of contract, unjust enrichment, and misappropriation of four technologies it considered trade secrets. Following a

two-week trial in April 2017, the jury awarded Cuker damages totaling $12,438,665. The award consisted of $30,629 for breach of contract; $400,000 for unjust enrichment; and a combined amount of $12,008,036 for misappropriation of the four alleged trade secrets. The jury found that Walmart's misappropriation of Cuker's trade secrets was "willful and malicious," except with respect to a trade secret identified as the "CMS Tweak Development Tool."

Following return of the verdict, the court ordered the parties to brief two issues: (1) what impact the underlying contract's limitation-of-liability clause had on the jury's award with respect to the CMS Tweak Development Tool, and (2) what permanent injunctive relief, if any, Cuker was entitled to in light of the jury's verdict. The parties stipulated to the limitation-of-liability issue, reducing the award of $2,788,690 for the CMS Tweak Development Tool to $547,090. They were unable to reach an agreement on the issue of injunctive relief. The court determined that although the contract did not entitle Cuker to injunctive relief, Ark. Code Ann. § 4-75-604(a) gave the court discretion to authorize enjoinment of "[a]ctual or threatened misappropriation" of trade secrets. Exercising its discretion, the court found the evidence presented at trial established that Walmart had saved itself roughly six months of development time by misappropriating Cuker's trade secrets, and that Cuker had satisfied its burden of showing it was entitled to injunctive relief against Walmart.

In summary, the court-ordered injunction (1) prohibited Walmart from utilizing specific codes, files, and programmatic references from all websites, code platforms, code repositories, and file repositories within its control, and required Walmart to delete permanently these items; (2) mandated that Walmart provide written notice instructing all third parties to whom it may have given any of Cuker's trade secrets to cease and desist from using Cuker's trade secrets and to destroy any copies of them; and (3) compelled Walmart to file an affidavit signed by a corporate officer attesting to compliance with the court's order.

After the court entered judgment in favor of Cuker, Walmart "marshaled an enormous number of arguments" in support of its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) and, in the alternative, for a new trial. The court found that many of Walmart's arguments did not need to be addressed because of the evidence supporting the jury's findings on Cuker's breach of contract, unjust enrichment, and trade secret claims.

Evidence presented at trial established a rapid deterioration of the parties' contractual relationship. Less than two weeks after the contract was signed, Walmart began demanding additional work outside the scope of the contract and then threatened to withhold approvals and thereby payments for completed within-scope work. Cuker protested early and often. Walmart never provided a workable development environment, as required under the contract, forcing Cuker to take on this additional responsibility in order to perform the contracted work. The court found that the evidence supported a finding that Cuker was compelled to choose between two unacceptable options: (1) perform an enormous amount of extra work that it never agreed to perform under the fixed-price contract and risk being unable to meet the "milestone" dates set out in the contract for the work it was obligated to do, or (2) refuse to do the additional work at the risk of not being paid for work it did perform under the contract.

Although the evidence was sufficient to sustain the jury's finding that Walmart breached the contract and was unjustly enriched, the district court found Cuker failed to present sufficient evidence that it undertook reasonable efforts to maintain the secrecy of three of the four alleged trade secrets, as required under Ark. Code Ann. § 4-75-601(4)(B). The court overturned the jury's damages award regarding the three trade secrets, and, of the $2,788,690 in damages awarded for the fourth trade secret, the court upheld only a portion of it. The court found only $314,392 of the award was supported by the evidence. The remainder was grounded in speculation or without sufficient proximate cause. The court entered an amended judgment in favor

-5-

of Cuker, reincorporating the terms of the injunction against Walmart, awarding damages in the amount of $745,021, and imposing $2,664,262.44 in sanctions, attorney fees, and taxable costs.

Cuker appeals the district court's decisions relating to misappropriation of its trade secrets and the reduction in the jury's award. Walmart cross-appeals the injunction, the denial of a new trial, and the denial of its Rule 50(b) motion.

## II.   Discussion

### 1.   Motion for Judgment as a Matter of Law

We review *de novo* a grant of judgment as a matter of law and apply the same standard as the district court. Liberty Mut. Fire Ins. Co. v. Scott, 486 F.3d 418, 422 (8th Cir. 2007). When reviewing a grant of judgment as a matter of law, we (1) resolve factual conflicts in the nonmovant's favor, (2) take as true all facts supporting the nonmovant that the evidence tends to prove, (3) construe all reasonable inferences in the nonmovant's favor, and (4) deny the motion if the evidence would allow reasonable jurors to reach different conclusions. Id. We must affirm the jury's verdict unless there is "a complete absence of facts" supporting the verdict, Kartheiser v. Am. Nat. Can Co., 271 F.3d 1135, 1137-38 (8th Cir. 2001), so that no reasonable jury could have found in the nonmoving party's favor, Tedder v. Am. Railcar Indus., Inc., 739 F.3d 1104, 1109 (8th Cir. 2014).

### A.   Cuker's Trade Secrets

The contract included the term "trade secret" within its definitions of intellectual property and confidential information, but did not define the term or identify information that constitutes a trade secret. In diversity cases, we look to state law when a contract is silent on an issue and follow controlling decisions of the state

Supreme Court. Jo Ann Howard & Assocs., P.C. v. Cassity, 868 F.3d 637, 650 (8th Cir. 2017); Cont'l Cas. Co. v. Allsop Lumber Co., 336 F.2d 445, 458 (8th Cir. 1964).

The Arkansas Trade Secrets Act ("ATSA") defines trade secret as information that:

> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4). The Arkansas Supreme Court has set forth six factors to consider when determining whether information is a trade secret: (1) the extent to which it is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard its secrecy; (4) its value to the company and competitors; (5) the amount of effort or money the company expended in developing it; and (6) the ease or difficulty with which others could properly acquire or duplicate it. Saforo & Assocs., Inc. v. Porocel Corp., 991 S.W.2d 117, 120-22 (Ark. 1999). An alleged trade secret must satisfy both the ATSA definition and all six Saforo factors to qualify as a trade secret. Wal-Mart Stores, Inc. v. P.O. Mkt., Inc., 66 S.W.3d 620, 630 (Ark. 2002).

It is undisputed that Cuker never told Walmart that the technologies at issue were trade secrets. Walmart argues this failure necessarily means that Cuker failed to reasonably protect the secrecy of the trade secrets. Cuker counters that consideration of the Saforo factors governs the trade secret inquiry and that the protective measures it undertook were reasonable under the circumstances. We

-7-

conclude that the evidence in the record supports the jury's finding that Cuker took reasonable efforts to protect only one of the alleged trade secrets, the Adobe Source Files. Because of Cuker's failure to take reasonable efforts to protect the other alleged trade secrets, the information is not subject to protection under the ATSA.

The Arkansas Supreme Court has made plain that it is "incumbent" on the party alleging trade secret misappropriation to "clearly identify what information it considered to be a trade secret, as that is a legal status fixed by statute." Tyson Foods, Inc. v. ConAgra, Inc., 79 S.W.3d 326, 334 (Ark. 2002). The record demonstrates a failure by Cuker to inform Walmart that the Phased Release Support Technique, CMS Tweak Development Tool, or Zoning Tools contained information it considered to be a trade secret at any time before the information was disclosed. Cuker's broad declaration that everything except the thirteen templates was its exclusive property was insufficient as a matter of law to clearly identify these technique or tools as trade secrets. Cuker's misappropriation claim as to these alleged trade secrets fails as a matter of law.

In contrast, Walmart knew about the significance of obtaining Cuker's Adobe Source Files. No other client had ever asked for nor had Cuker ever turned over its Adobe Source Files. Walmart's own emails demonstrate that it knew its request for the source files was "irregular." Walmart searched for a way to "phrase" its request so Cuker would not refuse. In another email, Walmart reached the conclusion that, due to the sensitivity of the request, it was not "an appropriate request by email." Cuker's damages expert testified that in his experience working with design firms, requests for source files are "normally pretty firmly rejected." A jury could reasonably infer from the evidence that Walmart knew Cuker's Adobe Source Files contained confidential materials and trade secrets and that Cuker was unlikely to turn that information over voluntarily.

Cuker took steps to protect its source files and did not acquiescence to Walmart's demands for them until compelled to do so. Cuker repeatedly declined Walmart's request to disclose the source files. It was not until Walmart made its approval and thus payment contingent on receipt of the Adobe Source Files that Cuker was forced to choose between two unacceptable options: (1) withhold the information and forgo payment to the employees for the work they had done under the contract, or (2) divulge confidential information that Walmart knew it was not entitled to receive in order to get paid for its work. The evidence in the record establishes that Cuker took reasonable steps to protect the secrecy of its Adobe Source Files and that only after Walmart's demands became unreasonable did Cuker reluctantly disclose the information.

It is indisputable on this record that Cuker's Adobe Source Files have economic value. Cuker described the Adobe Source Files as its "playbook" for creating responsive websites, a "buildup of know-how" learned through trial and error, a "proprietary way of laying out an optimized user experience for a Web page." Walmart's repeated and persistent requests for the source files is indicative of their value. Cuker's Adobe Source Files derive independent economic value from not being generally known or readily ascertainable, and others can obtain economic value from their use or disclosure.

Walmart's own witnesses confirmed that Walmart turned around and used Cuker's Adobe Source Files and disclosed them to others. Walmart claimed that it could not make the remaining templates match Cuker's templates without utilizing Cuker's Adobe Source Files. Under the ATSA, misappropriation of a trade secret occurs, in relevant part, when a person either (a) knows or has reason to know that the trade secret was acquired by improper means, or (b) discloses or uses the trade secret of another and knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it or acquired it under circumstances giving rise to a duty to maintain its secrecy or limit

its use. Ark. Code Ann. § 4-75-601(2). "Improper means" includes, in part, theft, bribery, or breach or inducement of a breach of a duty to maintain secrecy. Id. § 4-75-601(1). Evidence in the record establishes that Walmart used improper means to acquire Cuker's Adobe Source Files and that it did so wilfully and maliciously.

Cuker also challenges the district court's reduction in damages, arguing that recovery in a misappropriation case under an equitable theory does not require a showing of proximate cause. Contrary to Cuker's argument, Arkansas' Model Jury Instruction AMI 2600, titled "Claim for Damages Based upon Trade Secret Misappropriation," includes "proximate cause" as a requirement. Arkansas courts presume the Model Jury Instructions to be a correct statement of law. State v. Sola, 118 S.W.3d 95, 100 (Ark. 2003); accord Crayton v. State, 543 S.W.3d 544, 547 (Ark. Ct. App. 2018). Cuker's argument that a showing of proximate cause is not required is unavailing.

Although Cuker introduced evidence that it invested significantly in developing the Adobe Source Files to secure a competitive advantage and that Cuker's code (not its Adobe Source Files) appeared in the ASDA and Walmart2Go websites after its relationship with Walmart ended, it failed to provide any evidence linking the misappropriated Adobe Source Files to either the ASDA website or the Walmart2Go website. The record lacks evidence demonstrating that by obtaining Cuker's Adobe Source Files, Walmart's ASDA or Walmart2Go websites were made responsive any more quickly or less expensively than they otherwise would have been. We can find no error in the district court's analysis or conclusions on the reduction in damages based on Cuker's failure to establish proximate cause.

We turn next to Walmart's argument that the contract granted Walmart a perpetual and irrevocable license to use, reproduce, distribute, and authorize others to do any of these things with the Adobe Source Files because the Adobe Source Files constituted "deliverables" subject to licensing under the terms of the contract. The

-10-

district court interpreted the term "deliverables" as materials that Cuker "authored, developed, conceived, or created for Walmart." At trial, Cuker presented documents and testimony demonstrating that the Adobe Source Files predated its relationship with Walmart. They were not created for Walmart. Further, Cuker presented evidence to refute Walmart's claim that the Adobe Source Files were necessary to receive benefit from Cuker's services. Cuker had never before shared its Adobe Source Files with a client. There was ample evidence for a jury to find that Walmart did not need Cuker's Adobe Source Files to utilize the templates Cuker designed under the contract. Walmart's claim that it received a perpetual and irrevocable license to use, reproduce, or share Cuker's Adobe Source Files is without merit.

In conclusion, Cuker failed to present sufficient evidence to meet the statutory requirements for three of its trade secret claims. Walmart is entitled to judgment as a matter of law on Cuker's trade secret claims relating to the Phased Release Support Technique, CMS Tweak Development Tool, and Zoning Tools. Because sufficient evidence was presented to support a claim for misappropriation of Cuker's Adobe Source Files, we affirm the district court's decision. We also affirm the district court's reduction in damages based on Cuker's failure to establish proximate cause for all but $547,090 of the jury's award.

### B. Breach of Contract

Walmart argues that Cuker's continued performance and acceptance of contractual benefits waived Walmart's breach and that there is insufficient evidence that Walmart's breach excused Cuker's performance. The district court instructed the jury on material breach in a manner that almost identically follows the Arkansas Supreme Court's definition of material breach. See, e.g., Dye v. Diamante, 510 S.W.3d 759, 767 (Ark. 2017) ("A 'material breach' is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party. A material breach excuses the performance of the other party."). Although

-11-

Arkansas recognizes that one party waives another's breach by continuing to accept contractual benefits, see DWB, LLC v. D & T Pure Tr., 550 S.W.3d 420, 426 (Ark. Ct. App. 2018), the district court instructed the jury that it could consider either party's alleged acts, hindrances, or delays as evidence of breach.  The court's instruction fairly and adequately stated Arkansas law.

We are satisfied that the evidence in the record supports a finding that Walmart's acts, hindrances, or delays excused Cuker's performance.  Walmart failed to make the second contract payment on time.  It continually demanded that Cuker take on additional tasks and threatened to withhold payment for in-scope work if Cuker did not comply.  Walmart's failure to provide a development environment as required by the contract also impeded Cuker's ability to complete its contractual responsibilities.  There is more than sufficient evidence in this record from which a reasonable jury could find that Walmart materially breached the contract and thereby excused Cuker's performance under the contract.  Walmart is not entitled to judgment as a matter of law on the breach of contract claim.

Although there is a provision in the contract that limits Walmart's damages to the total contract price, we agree with the district court that the clause is exculpatory and that there is sufficient evidence of intentional wrongdoing to avoid the liability cap.  Under Arkansas law, an exculpatory clause is "one where a party seeks to absolve himself in advance of the consequences of his own negligence." Ingersoll-Rand Co. v. El Dorado Chem. Co., 283 S.W.3d 191, 195 (Ark. 2008) (internal quotation marks omitted) (quoting Jordan v. Diamond Equip. & Supply Co., 207 S.W.3d 525, 530 (Ark. 2005)).  Arkansas generally disfavors exculpatory clauses "due to the strong public policy of encouraging the exercise of care," and so, they are to be limited to their exact language and "'strictly construed against the party relying on them.'"  Id. (quoting Jordan, 207 S.W.3d  at 530); W. William Graham, Inc. v. City of Cave City, 709 S.W.2d 94, 96 (Ark. 1986).

As an exculpatory clause, the limitation-of-liability provision is to be strictly construed against Walmart and is enforceable if Cuker (1) knew of the potential liability that it released, (2) benefitted from the activity leading to the potential liability that it released, and (3) the parties fairly entered into the contract. See Ingersoll-Rand Co., 283 S.W.3d at 195. According to Walmart's argument, the activity for which Cuker released liability was the out-of-scope work. We fail to see how Cuker knew that it was releasing liability for out-of-scope work or that it benefitted from performing uncompensated additional work. Cuker repeatedly protested the additional work. It engaged in the project change procedure outlined by the contract and negotiated a price for the additional work. Walmart is not entitled to be released from liability for Cuker's out-of-scope work.

We are unpersuaded by Walmart's follow up argument that, even if the limitation-of-liability clause is an exculpatory clause, there is no evidence of intentional wrongdoing. There is more than sufficient evidence to find that Walmart intentionally demanded services that it knew were outside the scope of the contract and compelled to perform under protest. Because the provision includes "costs" in its damages cap, Walmart argues that the damages cap applies to attorney fees as a subset of costs. While attorney fees may be a subset of costs, the contract also explicitly indemnifies Walmart for "attorney[] fees and expenses" but not costs. Consulting Agreement § 10. Reading these sections together, Walmart demonstrated that it knew how to explicitly use the word "attorney fees" but chose not to in the limitation-of-liability provision. We affirm the district court's decision regarding the contract's limitation-of-liability provision.

## C. Unjust Enrichment

Walmart argues that the jury's finding of unjust enrichment must be reversed because (1) unjust enrichment is an equitable remedy that is unavailable if a contract exists, (2) the performance-compelled-under-protest exception does not apply, and

(3) there is insufficient evidence that it compelled Cuker to perform or that Cuker protested. We are unpersuaded by Walmart's arguments.

In Arkansas, parties with an enforceable contract must proceed on the contract in resolving their differences unless the "disputed performance is compelled under protest." QHG of Springdale, Inc. v. Archer, 373 S.W.3d 318, 325 (Ark. Ct. App. 2009). As previously noted, there is sufficient evidence to find Cuker protested early and often and that Cuker eventually performed under compulsion. As early as February 2014, Cuker objected to Walmart's demands for work outside the scope of the contract. Cuker's objections were met with threats from Walmart to withhold approvals and therefore payments. Walmart exploited Cuker's financial vulnerability by compelling work outside the contract's scope. When Cuker raised with Walmart the issue of the out-of-scope templates, Walmart insisted on receiving all of the templates without paying extra and threatened to "destroy" Cuker with its legal team. Because of Walmart's demands, Cuker was compelled to choose between breaching the contract or providing the extra templates and proprietary information requested by Walmart for free.

Walmart's arguments to disavow the jury verdict or reverse the district court's Rule 50 decision are unavailing. The evidence presented at trial was sufficient to establish Walmart was unjustly enriched.

### D. *Injunctive Relief*

Walmart challenges the district court's injunction directing Walmart to delete Cuker's Adobe Source Files from its computers. We review for abuse of discretion a district court's decision to issue an injunction. Gerlich v. Leath, 861 F.3d 697, 710 (8th Cir. 2017). "An injunction must not be 'broader than necessary to remedy the underlying wrong.'" Id. (quoting Coca-Cola Co. v. Purdy, 382 F.3d 774, 790 (8th Cir. 2004)).

-14-

The ATSA authorizes injunctions for "[a]ctual or threatened misappropriation." Ark. Code Ann. § 4-75-604 (a). "Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist; however, the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Id. § 4-75-604(b). Consistent with § 4-75-604(b), it was permissible for the district court to order Walmart to delete Cuker's Adobe Source Files. Cuker testified that the Adobe Source Files are a years-long compilation of technical know-how from which it continually draws. If allowed to keep the Adobe Source Files in its possession, Walmart could use them, or share them, in connection with another project. There is nothing to suggest that the Adobe Source Files' usefulness to Walmart has expired or will expire, and if it does, Walmart can apply to terminate the injunction. The district court did not abuse its discretion.

## 2. Motion for a New Trial

We review for abuse of discretion the denial of Walmart's motion for a new trial and "bear[] in mind that such motions 'are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred.'" Keller Farms, Inc. v. McGarity Flying Serv., LLC, 944 F.3d 975, 984 (8th Cir. 2019) (quoting United States v. Petroske, 928 F.3d 767, 774 (8th Cir. 2019)). Walmart contends that a new trial should be granted because of juror bias, erroneous evidentiary rulings, and improper jury instructions.

Walmart asserts that, during jury selection, a juror who was elected foreperson concealed her immediate family's involvement in ongoing litigation against Walmart when asked whether any previous experience had left her with "a very positive or negative feeling about Walmart that would have the effect of influencing [her] ability to be fair." In order to be entitled to a new trial based on concealed juror bias, one element Walmart has to prove is that the juror answered the jury selection questions

"dishonestly, not just inaccurately." Manuel v. MDOW Ins. Co., 791 F.3d 838, 842 (8th Cir. 2015). Walmart's evidence fails to show inaccuracy or dishonesty. It is possible that the foreperson's family's litigation either did not affect her feelings about Walmart or, if it did, the effect did not influence her ability to be fair. The district court did not abuse its discretion in denying a new trial due to juror bias.

Walmart also asserts as a basis for a new trial that the district court made erroneous evidentiary rulings. We review evidentiary rulings for abuse of discretion, giving "deference to the district judge who saw and heard the evidence." Simpson v. Cty. of Cape Girardeau, 879 F.3d 273, 277 (8th Cir. 2018) (internal quotations marks omitted) (quoting United States v. Johnson, 860 F.3d 1133, 1139 (8th Cir. 2017)). "A new trial will be awarded only if an evidentiary ruling constituted a clear and prejudicial abuse of discretion affecting a substantial right of the objecting party." Winter v. Novartis Pharm. Corp., 739 F.3d 405, 411 (8th Cir. 2014).

Walmart contends the court should not have excluded its expert testimony about whether, under the contract, items are "deliverables" or "work product" while allowing Cuker's expert to testify about whether items are "templates." The district court found that neither term "deliverable" nor "work product" was ambiguous. As such, the court precluded either party from offering evidence contradicting those definitions. We find no abuse of discretion, let alone clear and prejudicial abuse of discretion affecting the substantial right of a party.

With regard to the term "template," the district court determined that the term was not ambiguous but rather an industry-specific term in need of explanation by witnesses with specialized knowledge. Federal courts routinely allow contract experts to testify regarding the meaning of contract terms when the meaning depends on trade practice. See, e.g., Soo Line R.R. Co. v. Fruehauf Corp., 547 F.2d 1365, 1375 (8th Cir. 1977) (finding expert testimony was properly admitted to interpret technical construction specifications); Kona Tech. Corp. v. S. Pac. Transp. Co., 225

F.3d 595, 611 (5th Cir. 2000) (finding expert testimony was properly admitted to interpret industry-specific contract terms); <u>WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.</u>, 25 F.3d 422, 429 (7th Cir. 1994) (same). The parties chose to frame the scope of the contract in terms of number of templates. The court permitted expert testimony to explain an industry-specific contract term. Walmart, like Cuker, could have provided expert testimony on the meaning of "template." Neither the admission of Cuker's expert testimony nor the exclusion of Walmart's expert testimony was a clear and prejudicial abuse of discretion affecting Walmart's substantial rights.

Walmart's final argument for a new trial is that the district court improperly instructed the jury on the meaning of "malice." The district court instructed the jury that Walmart acted wilfully and maliciously if it "contemplated the existence of the trade secret and took actions in reckless disregard as to whether those actions would constitute misappropriation of that trade secret." Contrary to Walmart's contentions, "malice" does not always require actual intent under Arkansas law. <u>See, e.g.</u>, <u>Roeder v. United States</u>, 432 S.W.3d 627, 633-34 (Ark. 2014) (interpreting "malice" in an Arkansas statute to not require intentional acts). The malice instruction did not mislead the jury or have a probable effect on the verdict. <u>See</u> <u>Dean v. Searcey</u>, 893 F.3d 504, 521 (8th Cir. 2018) (ordering a new trial only if a jury instruction misleads the jury or has a probable effect on the verdict).

## III. Conclusion

Having carefully reviewed the arguments and the record, we affirm.

_____